# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

## H. G. Patterson v. S. W. Shaver, Executor of J. A. Riddel, Deceased, and C. T. Riddel.

November 14, 1935.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Browning and Eggleston, JJ.

The opinion states the case.

*George S. Harnsberger,* for the appellant.

*Edward C. Martz* and *E. D. Ott,* for the appellees.

HOLT, J., delivered the opinion of the court.

We have to determine if a contract to buy back corporate stock under certain named conditions is usurious.

The Standard Face Brick Corporation is a joint stock company chartered in Virginia, with power to issue stock

of two classes,—common stock in shares of no par value and preferred stock in shares whose par value is $100 each. This preferred stock is entitled to receive from surplus or net profits yearly dividends of seven per cent which are cumulative.

Herbert G. Patterson, appellant here, had purchased from the company through Mr. J. A. Riddel, vice-president and director, certain shares of this preferred stock. With each two shares so purchased went one share of common stock. Mr. Riddel was also the owner of some of this preferred stock, part of which he undertook to sell to Patterson, and did finally sell to him under this contract:

"For value received, I, J. A. Riddel, hereby assign and transfer to Herbert G. Patterson thirty-five shares of Class A—preferred seven per cent stock of the Standard Face Brick Corporation located at North Mountain, Augusta county, Virginia. This stock is secured by first lien on all real and personal property owned by said company.

"I, J. A. Riddel, agrees and binds myself as to payment of said stock, value of which is $100 per share, in addition to cumulative interest at the rate of seven per cent annually payable January 1, and July 1 each year.

"If default in payment is made by Standard Face Brick Company of either face value of stock and the interest, then the said J. A. Riddel agrees after the expiration of three years from this date to pay to said Herbert G. Patterson any part of this obligation unpaid at that date, and the value of same to be computed from date of this assignment which is $100 per share and interest that may accrue from this date on or not over three years from this date.

"Said Riddel agrees to guarantee to pay only such amount as may be if any unpaid at the date of three years from signing of this obligation, and when the Brick Company has paid to H. G. Patterson the sum of $100 for each share of stock held by him and the seven per cent interest on same, then the said Patterson has been paid in full and has no further claim on said Brick Corporation or

said J. A. Riddel, and surrenders all the stock which he secured under this contract to either the Brick Corporation or said J. A. Riddel.

"Witness my signature and seal this sixth day of July, 1928.

"Signed: J. A. Riddel (Seal)."

Is this a guaranty?

■ A guaranty is a collateral undertaking to answer for the performance of some primary duty by another in the event of his default. *Goodrich Rubber Co.* v. *Fisch,* 141 Va. 261, 127 S. E. 187; 28 Corpus Juris 878-887. It must be in writing and supported by an adequate consideration.

Plainly it would be a vain thing for a man to guarantee his own primary obligation or to be surety for himself.

It is contended here that no such obligation rests upon the Brick Company, and in support of that contention we are referred to this charter provision:

"The dividends on the preferred stock shall be cumulative, and shall be payable in preference and in priority to any payment to the redemption sinking fund hereinafter provided for and any dividends upon the common stock, and if any yearly dividends upon the preferred stock, or any semi-annual installment thereof, shall not have been declared and paid or set aside when due and payable, no payment shall thereafter be made to the redemption sinking fund, and no dividend upon the common stock shall thereafter be declared, and paid or set aside, until dividends at the rate of, but not exceeding, seven per cent per annum up to that time upon all preferred stock, then issued and outstanding, shall have been paid or set apart. At any time after the issue of the preferred stock it shall be subject to redemption at the option of the board of directors at the price of $100 for each share and the amount of the dividends accumulated and unpaid up to the time of redemption. After providing for the payment of all accumulated dividends upon the preferred stock at the rate of seven per centum per annum for each

and every fiscal year of the company, the remaining surplus or net profits as determined by the board of directors, shall be applied as follows:

"Within sixty days after December 31 of each and every year, at least five per centum of all net profits of the preceding fiscal year shall be paid into a fund to be known as the Preferred Stock Sinking Fund for the redemption of any and all of the preferred stock in such manner and upon such notice as the board of directors may determine."

It is true that redemption of this stock subject to conditions named was at the option of the board of directors, but the contract of sale went beyond this. Riddel under it was liable if there was default in the payment of "cumulative interest." Plainly cumulative dividends were here meant. A corporation pays no interest on stock.

"It is well settled, however, that preferred stockholders are not creditors of the company, nor are the dividends as to which they may be preferred to be regarded as interest upon a loan." *Drewry-Hughes Co.* v. *Throckmorton,* 120 Va. 859, 92 S. E. 818, 819.

There was default in the payment of all preferred dividends, and this cumulative contingent liability is still in force. The very purpose of guaranties is to provide for payments in the event of possible contingencies.

"Promoters, officers or directors, or others interested, may also agree with one who purchases stock from the corporation that if it fails to pay dividends at a specified rate they will make up any deficiency; or may guarantee that a subscriber to its stock will not suffer any loss, or that the corporation will receive certain notes and mortgages in full payment for the stock; or may agree to resell the stock for the purchaser, and in such case the officer will be held personally liable upon such agreement or guaranty." 12 Fletcher on Corporations (Perm. Ed.), section 5625, and cases cited.

If one is bound by such representations made in an effort to sell his company's stock, plainly he is bound by

them where he has undertaken to sell stock which he himself owns. In *Pratte* v. *Enslow,* 46 W. Va. 527, 33 S. E. 322, a guaranty of a twenty per cent dividend on stock was upheld. Indeed one may guarantee minimum profits to his associates in an attempt to form a partnership. *Ruckdeschall* v. *Seibel,* 126 Va. 359, 101 S. E. 425.

In determining the character of this contract, it is interesting to note that Riddel, who is presumed to have drafted it, in describing his liability uses the term "guarantee." It properly and accurately measures his liability.

As commonly understood, usury is interest in excess of that allowed by law. Here, as we have seen, the promise fairly construed was not to pay interest at all, but to pay the preferred dividends provided for by charter. Since there was no agreement to pay interest, the contract could not possibly be usurious.

If this were not a guaranty, the judgment which we have reached would still stand based upon a primary promise to buy back in certain contingencies at a certain time and at a certain price.

"The seller of corporate stock may agree to repurchase it at a specified price at the option of the buyer, or upon certain contingencies,* * *. An agreement of this character is generally regarded as being in the nature of a conditional sale, with an option in the purchaser to revoke or rescind it. * * * The mutual promises of the parties to sell and purchase constitute a sufficient consideration to support it, and it is not lacking in mutuality, where it forms a part of the original contract of sale." 12 Fletcher on Corporations (Perm. Ed.), section 5617. In support of this text many cases are cited. Among them may be noted, *Lyons* v. *Snider,* 136 Minn. 252, 161 N. W. 532, and *Paulson* v. *Weeks,* 80 Or. 468, 157 Pac. 590, Ann. Cas. 1918D, 741.

Such a contract violates no statute and is not against public policy. It is an ordinary valid one which grown men may make and we are not concerned with the fact that it may afterwards pinch one of the parties.

In *Raiche* v. *Morrison,* 47 Mont. 127, 130 Pac. 1074, it

appears that twenty shares of stock were sold for $1,000. The vendor agreed to purchase it at the end of three years for $1,720. That contract was upheld.

In *First National Bank of Hastings* v. *Corporation Securities Co.,* 128 Minn. 341, 150 N. W. 1084, 150 shares of stock for a consideration, the exact value of which does not appear, was sold to one Bradford coupled with an agreement to repurchase at a later date at the price of $150 per share. That contract the court sustained.

To the same effect is *Rogers* v. *Blouenstein,* 124 Ga. 501, 52 S. E. 617, 618, 3 L. R. A. (N. S.) 213, where it was said: "It is legally possible for one person to buy property from another and agree to resell it to the vendor at a higher price payable in the future. If such be the actual transaction, law will enforce it."

In Virginia this universal custom prevails among cattle dealers. They sell in the spring to those who own grazing lands, stock at so much per pound, and bind themselves to buy back in the fall at an advance. Such a contract has never been questioned.

██ A contract fair upon its face may be but a device to conceal a usurious transaction, but proof of this must appear by clear and cogent evidence. *Ruckdeschall* v. *Seibel, supra.*

Not only is there no clear evidence here of such a purpose but there is no evidence of it at all. Patterson paid in cash $3,150. Payment was made in two installments. For the first, this receipt was given: "Received payment by check on Planters Bank of Bridgewater, Virginia, for above shares. Two thousand and Seventy dollars this sixth day of July 28.

"Signed: J. A. Riddel."

The second payment was by check of date August 8 and for $1,080. These payments which amounted to $3,150 make up ninety per cent of the face value of stock sold. The vendor retained the common stock which ordinarily went with preferred stock as a bonus or inducement. It is fair to assume that it was then supposed to be of some

value. In other words, this transaction appears to have been one of purchase at par. Patterson was already the owner of preferred stock and nothing can be inferred from the fact that he bought another block. There is nothing to indicate a device conceived in fraud and designed to evade those penalties which attach to usury.

It is true that Riddel is dead, but there is ample proof of the contract and its details. It must be sustained.

Appellant is entitled to a judgment for the face value of his stock with seven per cent dividends thereon for three years, on which judgment interest should run at six per cent, and, of course, he must surrender it.

The decree appealed from should be reversed, and it is so ordered.

*Reversed.*